UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------x
                                              :
NANCY ELAINE KOUTRAKOS              :              3:13 CV 1290 (JGM)
                                              :
V.                                            :
                                              :
CAROLYN W. COLVIN,                     :
ACTING COMMISSIONER OF            :
SOCIAL SECURITY                        :              DATE: MARCH 16, 2015
                                              :
------------------------------------------------------- x

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE
DECISION OF THE COMMISSIONER, AND ON DEFENDANT'S MOTION TO AFFIRM THE
DECISION OF THE COMMISSIONER

        This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"].

I.  ADMINISTRATIVE PROCEEDINGS

        The case has a long procedural history which includes two previous appeals to this

district court.  See Koutrakos v. Astrue, 906 F. Supp. 2d 30 (D. Conn. 2012), approving and

adopting, 3:11 CV 306(CSH)(JGM), 2012 WL 1283427 (D. Conn. Jan. 9, 2012)["2011 Case"];

Koutrakos v. Astrue, 3:08 CV 791(CFD)["2008 Case"].  For the sake of thoroughness, the

entire procedural history, all of which stems from plaintiff's initial[1] application for DIB ten

years ago, will be recited herein.

        On November 23, 2005, plaintiff applied for DIB, claiming that she has been disabled

_____

        [1]It appears that plaintiff's 2005 application for DIB, discussed herein, was not her first
application for benefits.  On October 4, 2001, ALJ Roy P. Liberman issued his decision denying
plaintiff's applications for DIB and Supplemental Security Income ["SSI"], which were filed on
September 28, 1999, and in which plaintiff alleged disability since October 16, 1998 due to
abdominal pain, hernia repair, and a lower back disorder. (See Certified Transcript of
Administrative Proceedings, dated November 26, 2013, at 720-29)(the copy of ALJ Liberman's
decision is incomplete.).

since June 27, 2005 due to lower back pain, tendinitis, and left shoulder pain, resulting from a car accident. (See Certified Transcript of Administrative Proceedings, dated November 26, 2013 ["Tr."] 37, 43).[2] Plaintiff's application was denied initially and upon reconsideration. (See Tr. 22; see generally Tr. 138-45).  On July 3, 2006, plaintiff filed a request for a hearing by an Administrative Law Judge ["ALJ"](Tr. 33), and on March 29, 2007 and May 14, 2007, hearings were held before ALJ  Robert A. DiBiccaro, the latter of which was held for the purpose of soliciting testimony from a vocational expert, Kenneth R. Smith. (Tr. 354-95 (March hearing), 396-422 (May hearing); see Tr. 23-31).  In a decision dated July 27, 2007, the ALJ determined that plaintiff was not disabled. (Tr. 10-21).[3]  Plaintiff requested review of the ALJ's decision (Tr. 9A), and on March 19, 2008, the Appeals Council denied plaintiff's request for review (Tr. 4-6),  thereby rendering the ALJ's decision the final decision of the Commissioner.

Plaintiff then commenced an action in this Court, Koutrakos v. Astrue, 3:08 CV 791 (CFD), and on March 4, 2009, the Court granted defendant's voluntary Motion to Remand, directing that the case be remanded to the ALJ for vocational expert testimony. (Tr. 460-67; see Tr. 426); 2008 Case, Dkts. ##12-15.[4]  On July 1, 2009, the Appeals Council remanded the case to the ALJ (Tr. 468-71), and a pre-hearing conference was held on the record on

---

[2]A copy of the application does not appear in the two-volume, 1,394 page administrative record.  Not surprisingly, there is some duplication in the record.

As discussed in Section II. infra, on June 27, 2005, plaintiff was rear-ended, pushing her car into the vehicle in front of her.  (Tr. 360-61).

[3]There are two subsequent applications in the record – for DIB and SSI, both dated December 17, 2007, in which plaintiff claims an onset date of July 28, 2007.  (Tr. 475-79).

[4]During the earlier administrative proceedings, plaintiff was represented by out-of-state counsel retained by her long-term disability carrier, and she has been represented  by her current counsel since the matter was first brought to the federal court in 2008.  (Tr. 32, 457-59; see Tr. 34, 1074-75).

April 8, 2010 before ALJ DiBiccaro.  (Tr. 1071-95; see Tr. 451-56).  Thereafter, a hearing was

scheduled for August 5, 2010 so that a vocational expert could testify.  (Tr. 441-44; see Tr.

445-50).  On that date, the hearing was held and the vocational expert, Joseph Thompson,

C.R.C., testified by telephone, over the objection of plaintiff's counsel.  (Tr. 1147-71; see Tr.

1096-1175).  On December 23, 2010, the ALJ issued his notice of decision, denying plaintiff's

application for benefits. (Tr. 423-40).

On February 25, 2011, plaintiff filed a complaint in this Court, challenging, inter alia,

the ALJ's reliance on telephonic testimony from a vocational expert; on March 1, 2011, and

again on March 2, 2011, this case was referred from Senior United States District Judge

Charles S. Haight, Jr. to this Magistrate Judge.  2011 Case, Dkts. ##1, 6 & 8, 2012 WL

1283427, at *1-2.  On January 9, 2012, this Magistrate Judge issued a Recommended Ruling

on Plaintiff's Motion for Order Reversing the Decision of the Commissioner, and on

Defendant's Motion to Affirm the Decision of the Commissioner, 2012 WL 1283427, which

was approved and adopted by Judge Haight on April 13, 2012, thereby reversing and

remanding the matter pursuant to 42 U.S.C. § 405(g) for the "purpose of having the

vocational expert testify in person . . . ." 2011 Case, 906 F. Supp. 2d at 42. (See Tr. 1213-

55).

On June 13, 2012, SSA issued a Notice of Order of Appeals Council Remanding Case

to the Administrative Law Judge. (Tr. 1261-63; see also Tr. 1264-66). In the Order, the

Appeals Council vacated the prior decision and remanded "this case to an [ALJ] for further

proceedings consistent with the order of the court."  (Tr. 1263).  The Order also provided

that the ALJ "will offer the claimant the opportunity for a hearing, take any further action

needed to complete the administrative record and issue a new decision."  (Id.).   On March

3

4, 2013, a hearing was held before ALJ Deirdre Horton, at which Lawrence Takki, a vocational expert, testified by video-conference. (Tr. 1341-94; <u>see</u> Tr. 1267-77). On April 26, 2013, ALJ Horton issued an unfavorable decision, concluding that plaintiff was not under a disability at any time from June 27, 2005, the alleged onset date, through December 31, 2005, her date last insured (Tr. 1176-90), and sixty-one days later, the decision became the final decision of the Commissioner. (<u>See</u> Tr. 1177).

On September 3, 2013, plaintiff commenced this action (Dkt. #1),[5] and on January 9, 2014, defendant filed her answer. (Dkt. #15).[6] On June 16, 2014, plaintiff filed the pending Motion to Reverse the Decision of the Commissioner, and brief and exhibits in support (Dkt. #19; <u>see</u> Dkts. ##17-18),[7] and on September 2, 2014, defendant filed her Motion to Affirm, and brief in support. (Dkt. #23; <u>see</u> Dkts. ##20-22).

For the reasons stated below, plaintiff's Motion for Order to Reverse the Decision of the Commissioner (Dkt. #19) is <u>denied</u>, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #23) is <u>granted</u>.

---

[5]On the same day, plaintiff filed a Motion for Leave to Proceed <u>in forma pauperis</u> (Dkt. #2), which motion was granted the next day. (Dkt. #7).

[6]Attached to the Answer is a copy of the certified administrative transcript, dated November 26, 2013. Pages were omitted from the hearing decisions, dated April 26, 2013; accordingly, on September 16, 2014, a copy of the hearing decision was manually filed. (Dkt. #24).

[7]Attached to plaintiff's motion is a copy of case law.

4

## II. FACTUAL BACKGROUND

### A. MEDICAL HISTORY[8]

Plaintiff's medical records begin in 1981 when plaintiff was seen for headaches and abdominal pain, and then in 1982 and 1985 when she was seen for a rheumatological consultation for intermittent hand swelling, for which a definitive diagnosis could not be made.  (Tr. 932-36, 939-41; see Tr. 938, 942).[9]  In 1994, she was seen for epigastric burning.  (Tr. 815-16; see Tr. 917, 921-22, 925-26). In November 1998, plaintiff was seen for complaints of low back pain and a hernia.  (Tr. 799-800, 814; see also Tr. 865-66, 867-69, 891, 973-74, 979, 991-94, 1011-12).[10]  A month later, she was diagnosed with left rotator cuff tendinitis, left acromioclavicular joint arthritis, and left frozen shoulder.  (Tr. 193-94, 525-26, 734-36, 796-97; see also Tr. 195, 525, 909, 958-60).

Throughout 1999, it was noted that plaintiff has a "long history of [i]rritable [b]owel [s]yndrome[,]" and she complained of frequent headaches and abdominal pain.  (Tr. 527-28, 792-95, 801-02, 962, 966, 995; see Tr. 806-07, 809, 856-64, 873, 877, 879, 880, 882, 885, 893, 965, 977, 981, 996-97, 1009-10, 1023-26).  She had a large incarcerated hernia requiring surgical repair in February 1999.  (Tr. 789-91, 798, 803-05, 811, 813, 830, 884,

---

[8]As stated above, plaintiff's onset date of disability is June 27, 2005, and plaintiff's date last insured was December 31, 2005.   In her April 26, 2013 decision, ALJ Horton noted that plaintiff "concedes that subsequent injuries or new medical conditions, after December 31, 2005, are generally not involved in this appeal. [Plaintiff] argues that by December 31, 2005, she already had too many physical, medical limitations to sustain even sedentary jobs . . . ." (Tr. 1181).  Thus, to the extent they relate to plaintiff's 2005 application for DIB, plaintiff's nearly three decades worth of medical records that predate plaintiff's onset date will be referenced in summary form below.

[9]There is also a record of a normal chest x-ray taken in 1990.  (Tr. 928; see also Tr. 929-31, 943-47).

[10]A November 1998 MRI of plaintiff's lumbar spine was "[n]ormal" other than a pelvic mass.  (Tr. 524).

888, 968-71, 975, 1007-08, 1018-23).  In March 1999, an MRI of plaintiff's spine revealed "[m]ild thoracolumbar spondylolisthesis." (Tr. 892).  In May 1999, one of her doctors commented that she could not work due to "intense" back pain (Tr. 529, 788, 808, 971), however, as of December 1999, plaintiff could perform "[l]ight [w]ork."  (Tr. 1000-01). Plaintiff underwent pain management beginning in late June 1999  (Tr. 530-31, 786-87; see generally, Tr. 763, 783, 810 ("chronic pain, unclear etiology")), and she continued to have hernias despite prior surgery.  (Tr. 903-04, 988-89, 1032-33).  In December 1999, plaintiff underwent a rheumatological consultation, during which the "possible presence of an underlying early connective tissue disorder[ ]" was noted.  (Tr. 532, 764, 785, 987, 1002, 1034; see Tr. 765-76).

Plaintiff had "problems" with her right knee in January 2000 (Tr. 192, 533, 739, 983; see also Tr. 191, 535, 737, 826, 900-02, 985-86, 1031, 1036), along with low back pain with degenerative disc disease at L5-S1. (Tr. 534; see also Tr. 191, 536, 738, 853).[11]   As of June 2001, Dr. Walter E. Pleban of Fairfield County Surgical Associates, opined that plaintiff "has pain constantly involving her bones and joints[,]" and has "an inability to function with her daily life." (Tr. 537).  In July 2001, Dr. Pleban observed that "[every time] I see this person, she tells me she cannot do any work, she cannot function at all. . . . There is nothing I am doing for her at the present time. . . . I think that she cannot work at this point whether the problem is physical or otherwise remains to be seen." (Tr. 538, 740; see Tr. 538-39, 740-

_____

[11]In 2000, she was also treated for an ovarian cyst (Tr. 818-20; see Tr. 844, 852), another hernia (Tr. 1016, 1028, 1039, 1040-65), and other unrelated complaints.  (Tr. 846, 848-51, 854, 881, 883, 886-87, 894-95, 908, 963-64, 976, 998-99, 1004-06, 1035, 1037-38; see Tr. 870-72 (1998), 948-53).

41).[12]  In August 2001, plaintiff underwent a right knee arthroscopy at Bridgeport Hospital for degenerative disc disease in the right knee, and a SLAP tear at the right tibial plateau. (Tr. 183-87; see also Tr. 188-90).

Plaintiff was treated by Dr. Herbert Hermele of Orthopaedic Specialty Group from July 2004 to November 2004, for degenerative lumbar disk syndrome, chrodromalacia, right knee, and right thigh and groin pain.  (Tr. 177-82).  On June 27, 2005, plaintiff was involved in a motor vehicle accident in which her car was hit from the rear at a "fair rate of speed by a truck[ ]" while she was stopped waiting for a vehicle in front of her to turn.  (Tr. 175).[13]  Her car was pushed into the car in front of her; the airbags did not deploy; there was no loss of consciousness.  (Id.).  Plaintiff "hit the seat rest, flexion and extension type of mechanism. Seat itself was twisted."  (Id.).   The next day, she reported to Dr. Michael Connely that she had not "needed Oxycontin for [a] couple months – [but she] took [it] last night."  (Tr. 197).  She continued treatment with her general physician, Dr. Connely, for, among other ailments, right side abdominal pain and back and hip pain.  (Tr. 198-99, 205-06; see Tr. 200-03).  She resumed treatment with Dr. Hermele and Dr. Michael F. Saffir in July and August 2005 for a sprained neck and low back, multiple contusions, chronic cervical syndrome, and chronic lumbar syndrome. (Tr. 107-10; see Tr. 113-21, 173-74, 175-76). On July 6, 2005, x-rays of "the lumbar spine show[ed] some degenerative changes to L5-S1 interspace[,]" but

---

[12]Dr. Pleban referred plaintiff to the Lahey Clinic in Boston "for her chronic complaints." (Tr. 539, 741; see Tr. 742-62, 777-82).

[13]Following the accident, plaintiff became pregnant by artificial insemination and gave birth in July 2006. (See Tr. 296, 1143, 1356, 1359).  Plaintiff testified that her doctors knew she was going to go through this process to become pregnant and that they told her that physically, she would be "okay[.]"  (Tr. 1144-45; see Tr. 1359-60).  She was "out of work with her injuries and pregnancy, on a short-term and long-term disability as well as social security from Sodexho where she had been assigned at General Electric."  (Tr. 156; see also Tr. 208 (as of March 2007: "currently on long-term disability through Liberty Mutual[.]")).

"[o]therwise, [the] alignment [was] normal[,]" the hips showed "maintained joint space[,]" and the knee looked "reasonably well." (Tr. 176). Plaintiff underwent an MRI of her cervical spine on August 27, 2005, the result of which was a "[n]egative [c]ervical MRI." (Tr. 123, 125, 262).

As of September 2005, she presented with a strained supraspinatus in the left shoulder. (Tr. 111-12, 114, 168; see also Tr. 122-25, 169). She was also treated for hip pain. (Tr. 126, 165-66). On September 17, 2005, plaintiff underwent an MRI of her left shoulder which revealed a "[p]rominent abnormal signal within the distal supraspinatus tendon suggestive of an intrasubstance strain, without full thickness tear[,]" but an "[o]therwise unremarkable MR imaging study of the left shoulder." (Tr. 122, 124, 261). She underwent an MRI of her right hip on September 25, 2005, the result of which was that there were "some tiny subchondral cystic changes which [were] nonspecific[,]" and which "could" have been "some very small arthritic type cystic changes." (Tr. 121, 126, 344-45).

In October and December 2005, Dr. Saffir referred plaintiff for acupuncture, and in December, he "felt that she would probably not require surgery for [her] back . . . and that she could return to her light-duty job [that she was] currently doing." (Tr. 117-18, 162-63, 167-68; see also Tr. 115, 170 (in September 2005 - seeing Dr. Young Xu for acupuncture)). Dr. Saffir indicated that an MRI was deferred because of medical issues plaintiff was experiencing at that time. (Tr. 118, 168).

Plaintiff was seen for an independent medical examination ["IME"] by Dr. Edward M. Staub, an orthopedic surgeon, for her employer's long-term disability plan[14] on November 16, 2005. (Tr. 302-06). Dr. Staub reported that plaintiff has a history of lower back problems,

---

[14]See note 13 supra.

with a November 2004 diagnosis of degenerative disc disease.  (Tr. 303-04).  He opined that plaintiff could return to a light duty job.  (Tr. 305).

Plaintiff's complaints of persistent pain continued; however, electro diagnostic studies for the right arm and leg were benign.  (See Tr. 104-05, 119, 147-61; see Tr. 147 ("again normal electro diagnostic studies[]"; Dr. Saffir noted that he does "not have many recommendations left."), 152 ("lumbar MRI scan was noted to be benign and there were only mild findings for right DJD on prior imaging studies with Dr. Hermele."), 158 ("X-rays are totally unremarkable. . . . Etiology unclear.")).  In February 2006, plaintiff reported moderate to severe pain with prolonged sitting of more than an hour, and "difficulty doing computer work." (Tr. 119, 162; see generally Tr. 104-05).  In March 2006, Dr. Saffir restricted plaintiff to sedentary work with no heavy lifting of more than ten pounds. (Tr. 120, 161).

Plaintiff was seen by Dr. Staub for another IME on March 31, 2006, after which he reported to plaintiff's insurer that he recommended that she have a lumbar MRI, and then be re-evaluated.  (Tr. 299-300).  Two months later, Dr. Staub reported to her insurer that he did not think that further acupuncture treatment would help, and he recommended that plaintiff continue on a home exercise program.  (Tr. 297; see Tr. 294-98).  Dr. Staub opined that plaintiff is "suitable for a sedentary job[]" in which she could "stand and stretch periodically[.]" (Tr. 298).   He also opined that plaintiff "most likely had a preexisting condition that was aggravated by the accident[,] [and] [c]ertainly[,] her weight was a factor and still is a factor."  (Id.).

X-rays taken in July 2006 of plaintiff's foot and ankle revealed only "[s]oft tissue swelling[,]" (Tr. 136-37, 204), and an MRI of plaintiff's ankle, taken on August 1, 2006, revealed "[p]rominent abnormal bone marrow edema within the anterior and posteromedial

portion of the talus[,]" the origins of which are "unclear[,]" but would include "prominent bone bruise or stress changes of the bone." (Tr. 259-60).  In August 2006, Dr. Saffir noted that there was "[n]o significant underlying lumbar radicular component . . . evident based on the MRI scan[,]" and that he gave plaintiff a work note to keep her limited to "sedentary activity given [her] new left ankle bone bruise as well as [her] back and neck strain." (Tr. 155-56; see Tr. 295 (August lumbar   MRI was "negative."), 351-52 (MRI result: "unremarkable.")).   In September 2006, plaintiff's range of motion continued to be within "functional limits for both the upper extremities and the lower extremities, reaching behind her head and behind her back."  (Tr. 350).

In October 2006, Dr. Saffir noted that the results of the lumbar MRI scan were "benign and there were only mild findings for right hip DJD on prior imaging studies with Dr. Hermele."  (Tr. 343).  As of November 2006, Dr. Saffir noted that the "[o]verall findings are benign, within normal limits[,]" (Tr. 148, 336), and nerve conduction studies taken that month were normal (Tr. 337-41, 346-49), but he also noted that plaintiff "remains on limited activity with no heavy lifting more than [twenty] pounds, no climbing and occasional bending, kneeling, and reaching."  (Tr. 149-50, 333-34; see also Tr. 106).  On November 6, 2006, Dr. Lisa Webb of Neurological Specialists reported to Dr. Saffir that plaintiff had chronic myofascial pain about one and a half years ago following a motor vehicle collision and that "[a]side from a subjective right sided sensory disturbance, her neurologic examination . . . was normal."  (Tr. 324-26; see also Tr. 327, 335).  As of December 2006, Dr. Saffir did "not have many recommendations left."  (Tr. 332).

Plaintiff continued to be treated by Dr. Saffir in 2007 for her neck and shoulder pain, as well as low back pain radiating to her hip; Dr. Saffir found plaintiff "capable [of] sedentary

work, but that alternate positions would be necessary as constant sitting or standing would be limited and difficult." (Tr. 211; see Tr. 207-12, 331). In February 2007, Dr. Saffir opined that plaintiff "likely has a component of fibromyalgia[.]" (Tr. 209). On February 22, 2007, Dr. Saffir noted that plaintiff was "looking to resume work activities[,]" and he "believed that a resumption of regular activities including employment [would] be good for her overall health and state of mind." (Tr. 210). Plaintiff tested positive for Lyme disease that month (Tr. 214, 320-21), and the results of a whole body bone scan revealed "[s]lightly increased radiotracer activity within the left ankle and foot compared to the right." (Tr. 218-19, 258). The results of a Functional Capacity Evaluation for plaintiff's long-term disability benefits, undertaken in April 2007, reveal that plaintiff was capable of sedentary work. (Tr. 223-29, 307-13). An MRI of plaintiff's left shoulder, also taken in April 2007, revealed rotator cuff tendinosis. (Tr. 230-31). CT scans of plaintiff's abdomen and pelvis revealed no evidence of abscesses, but instead the "possibility" of a recurrent small ventral hernia. (Tr. 232-34).

Plaintiff was seen from January to October 2007 by Dr. Webb for her complaints of intermittent hand paresthesias. (Tr. 239-42, 315-23, 328). Electro diagnostic studies revealed "evidence of a very mild left carpal tunnel syndrome[.]" (Tr. 239, 315). Dr. Webb opined that plaintiff could perform light duty work, which would involve lifting and carrying up to twenty pounds occasionally, sitting occasionally, and standing and walking frequently, with the additional restriction of avoiding repetitive motion of the wrists. (Tr. 314).

In May 2007, Dr. Saffir reported to Liberty Mutual that plaintiff was capable of light work but without periods of long standing. (Tr. 330; see Tr. 353). Plaintiff was seen by Dr. Hermele in June 2007 for a consultation for a left shoulder arthroscopic rotator cuff repair, left shoulder subacromial decompression, and left shoulder AC joint resection. (Tr. 256-57).

In June 2007, plaintiff was seen at Yale University Gynecologic Oncology Center for a right adnexal mass, in July 2007, plaintiff underwent a bilateral salpingo-oophorectomy, total abdominal hysterectomy, and paniculectomy, and in August 2007, she was hospitalized for a pelvic abscess, which was followed, three weeks later, by a four-day hospitalization for abdominal pain.  (Tr. 263-87).

On June 13, 2007, plaintiff underwent an IME by Dr. John Marino, a physiatrist, who opined that plaintiff was capable of light or sedentary work with the ability to change positions from sitting to standing every twenty-five to thirty minutes, avoidance of turning her head from side to side repeatedly, avoidance of bending at the waist more than once a half hour, no frequent overhead activity, occasional reaching above shoulder level and below waist level, and her ability to lift and carry would be restricted to twenty-five pounds occasionally, and twenty pounds frequently.  (Tr. 292; see Tr. 288-93).[15]  In July 2007, Dr. Saffir opined that plaintiff "will likely remain in the sedentary to light category for future work activities[,]" and that she has limited functional capacity for squatting, crouching, kneeling, and crawling.  (Tr. 542; see Tr. 540-42).  In October 2007, Dr. Hermele noted that x-rays "done now of the pelvis, hips [are] unremarkable." (Tr. 543-44).  A month later, plaintiff was diagnosed with a left shoulder rotator cuff tear  (Tr. 545), and in November and December, Dr. Hermele noted plaintiff's symptoms of back pain were "[n]o better." (Tr. 546-47).[16]

_____

[15]Dr. Marino noted that plaintiff's past medical history included surgery for an ovarian cyst, cholecystectomy surgery, herniorrhaphy surgery, arthroscopic right knee surgery, gastric bypass surgery with a subsequent sixty-pound weight loss, acid reflux disease and on-going chronic abdominal pain of unclear etiology, and migraine headaches, as well as mild lower back pain from a previous motor vehicle accident, i.e., prior to the accident in June 2005.  (Tr. 290; see also Tr. 325, 1102-03).

[16]In 2008, plaintiff continued to be treated by Drs. Hermele and Saffir for bilateral carpal tunnel syndrome, osteoarthritis of the right hip, neck and upper extremity pain, and lower back pain (Tr. 548, 552-65, 567, 569-70), with x-ray results "essentially normal[,]" (Tr. 554), and on

B. MEDICATIONS

Plaintiff takes or has taken Percocet (Tr. 151), Cymbalta (Tr. 156), OxyContin (Tr. 86, 132-33, 151, 699), Motrin (Tr. 86, 132), Tylenol arthritis (Tr. 51, 59, 79, 86, 132-33), Celebrex (Tr. 132, 170), Effexor (Tr. 149), Lydocol patches (Tr. 51, 59), Skelaxin (Tr. 86), Elavil/Amitryptyline (Tr. 167, 699), Aleve (Tr. 170), Voltaren (Tr. 167), Imitrex (Tr. 86, 132), Aciphex (Tr. 132), Zantac (Tr. 132-33), Prevacid (Tr. 158), Prilosec (Tr. 133), Protonix (Tr. 132, 699), Premarin (Tr. 699), Ativan (id.), Xanax (id.), Fioricet (id.), Zomig (id.), Robaxin (id.), Allegra D (Tr. 86, 132), and Claritin D (Tr. 133). Plaintiff also reported that while she was pregnant and unable to take pain medication, she tried acupuncture for her neck and shoulder "which seemed to help somewhat [as she] was able to move [her] arm again[,] [b]ut it did not help [her] hip [and] lower back."  (Tr. 60, 1146).

C. WORK HISTORY

Plaintiff last worked as a general manager for Sodexho Food Services at the General Electric facility in Danbury from February 2005 to June 2005.  (Tr. 88; see also Tr. 61-62,

---

January 30, 2008, plaintiff underwent surgery on her left shoulder, which did not result in improvement. (See also Tr. 549–51, 566, 568, 574-78).

In May 2008, plaintiff was seen by Dr. Moshe Hasbani for a neurological consult; "the electro diagnostic evaluation was . . . not supportive of entrapment neuropathy or cervical radiculopathy." (Tr. 571-73).  Plaintiff was also treated at The Orthopaedic & Sports Medicine Center in 2008 for her cervical pain,  myofascial pain syndrome, and left shoulder pain.  (Tr. 577-84, 587-92).  Plaintiff underwent another left shoulder arthroscopy, rotator cuff repair and acromioplasty on October 13, 2008.  (Tr. 585-86).  In August of 2008, plaintiff injured her toe, left knee, wrist, and shoulder in a fall, which resulted in continuous medical treatment.  (Tr. 593-697).

In August 2009, plaintiff began pain management treatment for her neck pain, low back pain, and right hip pain at the Comprehensive Pain & Headache Treatment Centers, LLC.  (Tr. 698-704). She was seen at the Yale Neurology Clinic in July 2009, but had no "definable neurological condition."  (Tr. 705-08).

In June 2010, plaintiff was seen by Dr. K.N. Sena of Neurological Specialists, P.C. who opined that plaintiff is "totally disabled and is not capable of any form of gainful employment."  (Tr. 1067-70).

385, 401-02, 482, 1121-22, 1291, 1296, 1348, 1363).[17]   She prepared, delivered, and ordered food, oversaw day-to-day operations of the cafeteria, ran the cash register, did inventory, took catering orders, and supervised eight people.  (Tr. 38, 62, 402; see Tr. 1122, 1348-49, 1363).  Plaintiff would walk, stand, sit, stoop, reach, and write two hours of her work day, and she would climb, crouch and crawl for one hour.  (Tr. 38, 62).  She would handle, grab or grasp big objects for three hours of the day, and carry up to twenty or thirty-five pounds. (Tr. 38, 62, 403; see Tr. 1122-23, 1363).

Prior to working for Sodexho, she was self-employed as a cook and an operator of a café from August 2002 to February 2005, in which job she supervised five or six people, and lifted between ten and twenty pounds.  (Tr. 88; see Tr. 61, 63, 67, 385, 403-04, 1110-11, 1291, 1296, 1352-53).  From January to August 2002, she worked as an office manager for a boat dealership, and from 1993-98 she was employed as a waitress and hostess at a diner in Westport where she would work ten-hour shifts.  (Tr. 88; see Tr. 61, 64-65, 385-86, 404-05, 407, 480-81, 497-99, 1107-08, 1291, 1295-96, 1353, 1360-61).[18]  Plaintiff testified at March 2007 hearing that when she worked as a general manager, she was able to walk about a quarter of the time and sit three quarters of the time.  (Tr. 387-88; see also Tr. 405-06). Plaintiff also worked as a lounge manager in a bowling alley in 1995-96.  (Tr. 61, 66, 415, 1362-63).  According to plaintiff, in "most of [her] jobs[,]" she was "required . . . to stand or walk [eight] hours a day[,]" but she can no longer do that, nor can she sit for long

---

[17]At the March 2013 hearing, plaintiff testified that she had "recently" tried to "do some substitute teaching" in an elementary school.  (Tr. 1349).  She worked "[a] week here, . . . a couple [of] weeks there[,]" but "maybe not even [ten] times[,]" and never a full week. (Tr. 1350). Additionally, in May or June of 2012, plaintiff was hired to work as a manager in a restaurant in Lake George, but she only worked half of her first day because she "couldn't do that." (Tr. 1351).

[18]For the period in the late 1990s and early 2000s, plaintiff was out of work due to "abdominal issues" and hernias.  (Tr. 1106-07; see also Tr. 405).

periods of time.  (Tr. 68; see also Tr. 73, 405, 1109).

In a January 31, 2006 Vocational Analysis completed for Connecticut Disability Determination Services ["DDS"], plaintiff was found not disabled.  (Tr. 83).  At that time, she was "expected to be able to return to her past work as an office manager, . . . because it [was] described as sedentary work."  (Id.).  As referenced above, plaintiff received long-term disability benefits through her job at Sodehxo until December 2009, when she was terminated.  (Tr. 117, 226).[19]

### D. HEARING TESTIMONY[20] AND PLAINTIFF'S REPORTS TO SSA

Plaintiff was born in 1965, and at the time of her alleged onset date of disability in June 2005, she was forty years old.  (See Tr. 370, 1102).   Plaintiff has two Associates degrees, one in travel and tourism, and one in hotel restaurant management  (Tr. 371, 412, 1105, 1356; see also Tr. 41 (2 years of college)), and she worked full-time while attaining these degrees. (Tr. 1105).   At the time of her first hearing on March 29, 2007, plaintiff was living with her brother, along with her eight-and-a-half month old daughter[21]; her father also lived with them "on and off."  (Tr. 368, 370).   Three years later, plaintiff testified

---

[19]See note 13 supra.

[20]There were no less than five hearings held at the administrative level – hearings on March 29, 2007, May 14, 2007, April 8, 2010, and August 5, 2010, before ALJ DiBiccaro, and a hearing held on March 4, 2013, before ALJ Horton. The April 8, 2010 hearing was, in fact, a pre-hearing conference requested by plaintiff's counsel and plaintiff was not present to testify. (Tr. 1071, 1073).  Counsel explained to the ALJ that plaintiff's prior counsel, who was retained by her long-term disability carrier, did not "attempt to find out whether or not there were prior claims." (Tr. 1074-75).  Plaintiff's counsel, who is her current counsel, provided ALJ DiBiccaro with plaintiff's prior hearing decision and prior medical records and posited that the file is relevant to plaintiff's 2005 application, and particularly, to the ALJ's credibility determination.  (Tr. 1078-79). Additionally, in light of plaintiff's continuing medical issues, the ALJ stated that "if I find that as of [December 2005] [and] I think I do need evidence that's ongoing and current that relates to those particular impairments[,]" then plaintiff's counsel can provide them. (Tr. 1086).

[21]See note 13 supra.

unequivocally that she lived with both her brother and father in her brother's home.  (Tr. 1104).  According to plaintiff, she could not hold her daughter, who at the time of her first hearing weighed nineteen pounds, for long periods while standing, and she could not hold her on her left side.  (Tr. 369, 378).

In her Symptom Questionnaire, completed in January 2006 for the State of Connecticut DDS (Tr. 58-60), plaintiff reported left shoulder and arm pain, neck pain, lower back and right sided hip pain, and problems grasping.  (Tr. 58). In the same year, plaintiff reported that her typical day included eating breakfast, reading the newspaper, getting ready for appointments, if she has any, running errands, making dinner, and then watching television before going to bed.  (Tr. 49).  Plaintiff drove herself to her appointments and to run errands.  (Tr. 371, 1104-05, 1146-47).  According to plaintiff, she had "problems" prepping food, and she could not prepare large meals without experiencing pain.  (Tr. 51). At that time, plaintiff reported that she could not walk or sit for more than thirty minutes, and that she had problems bending and putting on socks.  (Tr. 50; see also Tr. 54 (long car trips are "a problem[;]" sitting for "more than an hour is painful"); Tr. 55-58).  According to plaintiff, when she "tried to walk for exercise[, she] cause[d] [her]self to have severe pain for weeks [with] the pain travel[ing] from [her] hip to [her] groin down to the he[e]l of [her] foot."  (Tr. 58).

In 2006, plaintiff reported that she was able to grocery shop, but she reported that she could not "walk much or shop [because it was] too painful" such that she only did it "when [she had] to[.]" (Tr. 53).  Plaintiff testified at the March 2007 hearing that she could not walk through a grocery store, and she could only walk "about a half-hour[] . . . [to] an hour tops[]" before she needed to rest.  (Tr. 375). She also testified that she could sit for

"maybe tops two hours[]" because she could not stay in one position because of the pain. (Tr. 376).   Plaintiff would lie down to "try to regain . . . . [a] relative comfort level." (Tr. 378).  According to plaintiff, she has to lay in bed all day a "couple" of times in a month.  (Tr. 380-81).

Plaintiff also reported that she does laundry, but cannot lift or carry the clothing, and she does not wash floors, sweep, mop or vacuum; her brother does all of the housework. (Tr. 52, 73, 381, 383, 1146).   She also reported that she used to read books but she cannot stay focused, and she used to play bingo but she can no longer sit for that long.  (Tr. 53). However, she can follow instructions, handle stress, and handle changes in routine.  (Tr. 56). Plaintiff reported that the more activities she would do, the more pain she experiences, and that she is in pain "all the time[.]" (Tr. 59; see also Tr. 1365 ("the more [she] did[,] the less [she was] able to do[]")).

### 1. ONSET DATE OF DISABILITY

Plaintiff testified that she was rear-ended on June 27, 2005 while she was driving home from work.  (Tr. 361).  Plaintiff was in a mini-van, stopped, waiting for a car in front of her to turn, when a truck hit her from behind, pushing her car into the car in front of her with force that caused her hair clip to break.  (Tr. 1127-28, 1131-32).  Her seat twisted "[f]rom the force of the collision[,]" and her car was totaled.  (Tr. 1129, 1132).   The next day, she was seen by her primary care physician who, in plaintiff's words, told her to rest and ice her neck, left shoulder, back and hip, and the following day, she was nauseous, vomiting, and unable to "put [her] head off the pillow[]" as a result of migraine headaches

and her intense neck pain. (Tr. 361-62, 1131, 1133; <u>see</u> Tr. 1357).[22] Plaintiff reported that she was experiencing at least three migraines a month, which could last three days in a row, and Imitrex does not always help. (Tr. 363-64).

Following the accident, plaintiff suffers from right hip pain that "never goes away." (Tr. 364-65). According to plaintiff, MRIs "showed pretty much nothing[,]" except "[they] did show the degenerative arthritis in [her] lower back, . . . and maybe some calcium deposit. But [she] continued to have this incredible pain . . . , and it still hasn't gone away." (Tr. 1136). Plaintiff testified that there "are times when this hip completely gives out on [her]." (Tr. 1137).

Plaintiff also testified about knee pain that pre-dated her automobile accident, but that has worsened since then, along with pain in her "whole right leg[.]" (Tr. 365-66; <u>see also</u> Tr. 1139-40). Plaintiff additionally reported that she has "very minimal use of the left side[,]" and she is left handed. (Tr. 367; <u>see</u> Tr. 1358, 1365-66). She has weakness in both hands, but more so in the left, such that she cannot grasp or hold items. (Tr. 367; <u>see</u> Tr. 1141, 1358). According to plaintiff, this happens at least once a week. (Tr. 1142-43). She testified that her neck pain causes her to be unable to grab, lift, or hold items with two hands, and it causes numbness in both arms. (Tr. 1138, 1140-41). She also testified that after the accident, she could not use a keyboard for "long periods of time[,]" meaning that she could only sit for fifteen or twenty minutes, and she could not type because it caused pain in her neck. (Tr. 1364).

According to plaintiff, right before she gave birth to her daughter in 2006, Dr.

---

[22]Plaintiff also testified that her neck pain started after an accident in 1992, when she had whiplash. (Tr. 1365).

Hermele discovered, through an x-ray, that plaintiff's ankle was "bleeding inside[,]" so she was put in a cast for four weeks.  (Tr. 372).  Plaintiff testified that in June 2007, "they finally redid the MRI and saw that the rotator cuff was torn."  (Tr. 1135).

<u>2. VOCATIONAL TESTIMONY</u>

At her first hearing, ALJ DiBiccaro asked plaintiff if she could work in a job where she would "put caps on perfume bottles or something[,]" which entailed sitting for two and a half hours before having a break to stand; plaintiff responded that she could not do such a job because of the repetitive motion involved.  (Tr. 389-90).   A second hearing commenced on May 14, 2007 for the purpose of taking vocational expert testimony.  (<u>See</u> Tr. 396-422). Kenneth R. Smith, the vocational expert, testified that plaintiff's past relevant work as a manager in food service was skilled, medium work, as performed, her past work as an office manager was skilled and sedentary, and her past work as a manager of a lounge in the bowling alley was medium work.  (Tr. 412-16).

Smith then testified that a claimant with a sedentary capacity but a maximum lifting ability of five pounds occasionally, occasional standing, walking and stooping, occasional use of upper extremities for reaching and repetitive use of hands for grasping, handling and fine fingering, could not perform plaintiff's past work.  (Tr. 417).   If the residual functional capacity was changed to unskilled occupations, the occupational base would be "severely limit[ed][,]" such that only a surveillance system monitor job would be available. (Tr. 417-18).   Additionally, plaintiff's skill base would be transferable to jobs that involve frequent use of hands, which work she cannot perform.  (Tr. 418-19).  When the additional limitations of laying down two hours a day because of back pain, and absenteeism due to unpredictable headaches were added, Smith testified that the work of a surveillance monitor could not be

performed.  (Tr. 420).

On August 5, 2010, Joseph L. Thompson testified as a vocational expert at a third hearing before ALJ DiBiccaro.  (Tr. 1147-74).  Plaintiff's counsel objected to having Thompson's testimony taken by telephone, and to Thompson's qualifications as Thompson was currently employed by an insurance company; both objections were overruled.  (Tr. 1149-50).  Thompson testified that a person who could perform sedentary work with occasional reaching overhead with dominant left upper extremity, occasional handling, grasping, and fingering with the dominant left upper extremity, occasional standing, walking, bending, and stooping, and who has to avoid concentrated exposure to vibrations, could not perform plaintiff's past work as a chef, hostess/manager, event planner, and office manager, and such person could not perform the work of a general manager as such job was performed by plaintiff.  (Tr. 1153-55).  The vocational expert testified that such a person could perform the work of a surveillance system monitor because such job does not call for reaching, handling and fingering.  (Tr. 1155-56).  However, as plaintiff's counsel pointed out, the job of a surveillance system monitor is a government service position, and it specifically refers to the premises of public transportation terminals.  (Tr. 1159).  In light of that limitations, Thompson clarified that, in fact, there would be under fifty, or a "minimal" number of such jobs available in Connecticut, and 30,000 "in the country as a whole."  (Tr. 1161-62).  This job would also require close concentration, movement of the neck, and persistence and pace to maintain the view of the screens at all times.  (Tr. 1163).

When the hypothetical was altered to a sedentary semi-skilled occupational base, the vocational expert testified that such person could perform the work of a telephone solicitor, which involves no more than occasional use of the upper extremities, and such person could

perform the work of an information clerk.  (Tr. 1157-58).  However, if the hypothetical was altered such that a person could only use the upper extremities for less than a third of the workday, or up to ten to fifteen percent of the workday, such restriction rules out the sedentary semi-skilled and the unskilled base such that no jobs would be available.  (Tr. 1158).

In response to plaintiff's counsel's hypothetical of a person with the residual functional capacity to perform sedentary work, with the ability to lift a maximum of five pounds occasionally, occasionally standing, walking, stooping, using upper extremities for reaching, and repetitively using of the hands for grasping, handling and fine fingering, the vocational expert testified that such person could not perform any of plaintiff's past work.  (Tr. 1166).  If such a person were performing skilled work, "from a technical standpoint, the five pound lifting [restriction] . . . would eliminate employment[,]" but "from a practical standpoint[,]" the informational clerk and telephone solicitor positions "would not involve lifting anything more and would fit the hypothetical[,]" but the requirement of frequent fingering to use a pen would eliminate the position of a telephone solicitor.  (Tr. 1167, 1170).  If a person would have to take more than two unscheduled breaks in the day, or would have three or more unexplained and unplanned absences in a month, all employment would be excluded.  (Tr. 1171).

In 2013, Lawrence Takki[23] testified as a vocational expert at a hearing before ALJ Horton.  (Tr. 1366-93; see also Tr. 1274-75, 1341).  Based on plaintiff's transferable skills, Takki first testified that plaintiff could perform data entry work or could work as an

---

[23]The hearing transcript refers to the phonetic spelling of his name - Tachie.  (See Tr. 1341, 1366-93).

appointment clerk, or as a food checker at a cafeteria.  (Tr. 1374-75).  The ALJ then posed a hypothetical of an individual who is limited to sedentary work but is further limited to occasional overhead reaching with her left dominant arm and is limited to occasional standing, walking, bending and stooping, and must avoid concentrated exposures to vibrations.  (Tr. 1375).  The vocational expert testified that such a person could not perform plaintiff's past work, with the exception of her work as an office manager which job was sedentary.  (Id.).  If the hypothetical individual was "further limited such that handling, grasping and fingering with the dominant left hand were also limited to occasional[,]" the foregoing jobs would be eliminated but such an individual could perform the work of an information clerk, a surveillance system monitor, and a dispatcher, provided that for the dispatcher position, the individual has knowledge of the area roads. (Tr. 1376-78).  If such an individual was off task more than twenty percent of the day, there would be no work that the person could perform  (Tr. 1378), and if such individual was restricted to handling, grasping and fingering less than ten percent of the work day, the individual could not perform the work of an information clerk.  (Tr. 1387-88).  Additionally, there is no work that can be performed by an individual who would be out of work one to two days a month consistently.  (Tr. 1389-90).

After probing inquiry from plaintiff's counsel, the vocational expert testified that there are ten surveillance system monitor jobs in Connecticut and 958 nationwide, and there are 1,296 information clerk positions in Connecticut, which positions include greeters in retail establishments (Tr. 1384, 1386; see Tr. 1381-87), although in 2005, these jobs were "more plentiful[.]" (Tr. 1391).  Takki also testified that the surveillance system monitor job as performed in accordance with the Dictionary of Occupational Titles is a government services

job.  (Tr. 1393).

 E. MEDICAL OPINIONS

  On January 30, 2006, Dr. Firooz Golkar completed a Residual Functional Capacity Assessment of plaintiff in which he opined that plaintiff can occasionally lift twenty pounds, she can frequently lift ten pounds, she can stand and/or walk or sit for about six hours in an eight-hour workday, and her ability to push or pull is unlimited.  (Tr. 96; see Tr. 95-102). Dr. Golkar also opined that plaintiff can occasionally climb, balance, stoop, kneel, crouch and crawl, she is limited to occasional overhead reaching on the left side, and plaintiff should avoid concentrated exposure to vibrations.  (Tr. 97-99).  In reaching his conclusion, Dr. Golkar relied on medical records from 2005.  (Tr. 102).

  On April 12, 2006, Thomas Hanny, MD, completed a Physical Residual Functional Capacity Assessment of plaintiff in which he only noted that he "reviewed all the evidence in [the] file and the assessment of 1/30/2006 is affirmed, as written."  (Tr. 145; see Tr. 138-45).

  On March 23, 2007, Dr. Connely completed a Pain Questionnaire on behalf of plaintiff in which he noted her diagnoses of chronic pain in her back and abdomen, and depression. (Tr. 90, 250).  According to Dr. Connely, plaintiff has reduced range of motion, moderate limitations in her ability to handle stress, difficulty with concentration, attention, persistence and pace, difficulty managing multiple tasks, difficulty thinking, reduced awareness of hazards, restrictions in her performance of daily tasks, and difficulty with her memory.  (Id.). Dr. Connely opined that plaintiff's pain would frequently interfere with her ability to work, she can only sit for about two hours, and stand and walk for less than two hours, and she can grasp or perform fine manipulations about fifty percent of the time, and can only reach about

ten percent of her work day.  (Id.).  Additionally, plaintiff can occasionally lift and carry less than ten pounds, and would likely be absent from work due to chronic pain three times a month.  (Id.).

## III. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.  Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted).  "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error."  Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008), quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); see also 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence

24

and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See  42 U.S.C.  § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working.  See 20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment.  See 20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. § 404.1520(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. § 404.1520(a)(4)(iii); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work.  See 20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant shows that she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits

25

only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R.  §§ 404.1520(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

## IV.  DISCUSSION

In the December 23, 2010 decision following the first remand order, ALJ DiBiccaro found that plaintiff has not engaged in substantial gainful activity during the period from her alleged onset date of June 27, 2005 through her date last insured of December 31, 2005. (Tr. 430).[24]  The ALJ then concluded that plaintiff has the following severe impairments: vascular headaches, cervical and left (dominant) shoulder pain from a June 2005 automobile accident, obesity and gastric bypass surgery in 2004, lumbar disc condition, and left rotator cuff condition, with surgery after her date last insured.  (Id.).  Additionally, plaintiff has intermittent, non-severe feelings of situational depression, which is not a severe impairment, and after her date last insured, she suffered another fall in August 2008, which resulted in additional strains to her wrist, knee and left foot which are not pertinent to this claim.  (Tr. 430-31).  In the third step of the evaluation process, the ALJ concluded that through plaintiff's date last insured, plaintiff's impairment or combination of impairments do not meet or equal an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404.  (Tr. 431).  In addition, at step four, ALJ DiBiccaro found that after consideration of the entire record, from June 2005 though December 31, 2005, plaintiff had the residual functional capacity to perform a wide range of sedentary work as defined in 20 C.F.R. § 404.1567(a), although plaintiff was limited to occasional reaching overhead with her dominant left arm; occasional

---

[24]The ALJ also noted that plaintiff's "date last insured under Title II, for [DIB], is a key factor in the appeal[,]" which narrows the period between her alleged onset date to her date last insured to six months.  (Tr. 427, 430).

handling, grasping and fingering with that dominant hand; and occasional standing, walking, bending, and stooping, and she needed to avoid concentrated exposure to vibration. (Tr. 431-36). The ALJ concluded that through plaintiff's date last insured, plaintiff was unable to perform her past relevant work as a chef, event manager, hostess/manager, and self employed restaurant chef/owner; however, she could perform the duties of her past relevant occupation as a general manager in food service, as customarily performed in the national economy, as that job generally requires only sedentary duties and occasional reaching and handling. (Tr. 436). According to the ALJ, plaintiff acquired works skills involving customer service, organizing work and directing others' work, and such skills are transferable to the sedentary job of information clerk. (Tr. 437). The ALJ also concluded that in addition to plaintiff's ability to perform the past relevant job identified by the vocational expert, plaintiff can also perform the jobs of information clerk and surveillance system monitor. (Tr. 438-39). Accordingly, the ALJ concluded that plaintiff was not under a disability at any time from June 27, 2005 through December 31, 2005, her date last insured. (Tr. 439).

In the 2011 Case, in addition to asserting that the ALJ erred in relying on improper "phoned in" testimony (11 CV 306, Dkt. #19, at 15-20), plaintiff asserted that the testimony of the vocational witness was unsupported, incompetent, and was in clear, unresolved conflict with the Dictionary of Occupational Titles (id. at 21-27); the ALJ did not apply the "treating source rule" as required (id. at 27-30); the ALJ did not perform a proper "combination of impairments" analysis (id. at 31-33); the ALJ's assessment of plaintiff's credibility was flawed (id. at 33-34); and the ALJ failed to assess adequately plaintiff's claims of pain (id. at 35-37). Rather than address each of these contentions, this Magistrate Judge's Recommended Ruling, which was approved and adopted by Judge Haight, remanded

the case in light of the vocational expert testimony that was improperly taken by telephone, and ordered a de novo review of the case upon remand.  Specifically, this Court held that:

> The Court need not address plaintiff's other arguments as upon remand and after a de novo hearing, defendant shall review this matter in its entirety, assessing plaintiff's alleged impairments in combination, considering and applying the treating physician rule, assessing plaintiff's credibility and pain, and considering the vocational expert's testimony in light of plaintiff's previous work and supported limitations.

2012 WL 1283427, at *7.  The foregoing notwithstanding, ALJ Horton noted:

> The April 2012 Court Remand Order primarily addresses the dispute between the Commissioner and the claimant as to the acceptability of telephonic vocational testimony.  In summary, the CT District Court held that unless the claimant agrees to waive in-person testimony by a vocational expert–and until the Commissioner addresses the procedure in federal rule-making–taking testimony by telephone is inadequate. Consequently, this decision does not utilize prior vocational testimony.  The Court did not comment beyond the problem of vocational testimony.  The claimant's 2007 and 2010 testimony remains of value.  The Remand Order does not address pain, credibility or treating source opinions.

(Tr. 1180)(internal citations omitted).  ALJ Horton's decision that followed, however, does not reflect that a de novo review was in fact done. Following the five-step evaluation process, ALJ Horton concluded that plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of June 27, 2005 through her date last insured of December 31, 2005.  (Tr. 1183, citing 20 C.F.R. § 404.1571 et seq.).   At step two, just as ALJ DiBiccaro concluded, ALJ Horton concluded that plaintiff has the following severe impairments: vascular headaches, cervical and left (dominant) shoulder pain, obesity and gastric bypass surgery in 2004, lumbar disc condition, and left rotator cuff condition.  (Tr. 1183-84, citing 20 C.F.R. § 404.1520(c); see also Tr. 430).   In the third step of the evaluation process, again, just as ALJ DiBiccaro found, the ALJ concluded that through plaintiff's date last insured, plaintiff's impairment or combination of impairments do not meet

or equal an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404.  (Tr. 1184,

citing 20 C.F.R. Part, Subpt. P, App. 1; 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526;

see Tr. 431).  ALJ Horton added that while plaintiff

> emphasizes chronic neck, shoulder and left upper extremity pain related to
> a June 2005 car accident[,] [t]hose conditions do not meet or equal Listing
> Sections 1.00 and 1.04, pertaining to musculoskeletal and disc impairments.
> [Plaintiff] also claims migraine headaches. The Appeals Council and Court
> have not changed the prior finding that her combined impairments do not
> meet or equal any Listing.

(Tr. 1184)(emphasis added). In addition, at step four, like ALJ DiBiccaro, ALJ Horton found

that after consideration of the entire record through the date last insured, plaintiff had the

residual functional capacity to perform a wide range of sedentary work as defined in 20

C.F.R. § 404.1567(a), except that she is limited to occasional reaching overhead with her

dominant left arm; occasional handling, grasping and fingering with that dominant hand; and

occasional standing, walking, bending, stooping, kneeling, crouching and crawling;  her

nondominant right shoulder, arm, hand and fingers are unlimited at the sedentary level; and

she needs to avoid concentrated exposure to vibration.  (Tr. 1184-87; see Tr.431-36).   The

ALJ states: "The Appeals Council upheld the prior finding that the claimant could perform a

wide range of sedentary duties, and the Court did not disturb the RFC finding of the 2010

decision.  Rather, the Court focused on further vocational testimony here." (Tr. 1186).  The

ALJ added:

> Due to her DLI, [plaintiff's] two attorneys have tried, tenaciously, to connect
> her chronic pain to the June 2005 accident.  However, the Court and Appeals
> Council did not find convincing evidence to find total disability in terms of her
> RFC, or to disturb the RFC stated in 2010. (The first hearing decision
> apparently had errors in the job numbers at step five, not the analysis of
> credibility.  The 2012 Remand Orders do not find fault with the credibility
> analysis, even though counsel contests that analysis.)

(Tr. 1187). ALJ Horton then concluded that through plaintiff's date last insured of December

31, 2005, plaintiff was unable to perform her past relevant work as a restaurant manager, a food service manager, and a waitress; however, she could perform the duties of her past relevant work in customer service and in inventory control.  (Tr. 1187-88).  According to the ALJ, there are jobs that exist in significant numbers in the national economy that plaintiff could perform, through her date last insured, including the jobs of surveillance monitor and information clerk, and, under the framework of Rule 201.28 (without transferable skills) and Rule 201.29 (with transferable skills), plaintiff was not disabled through her date last insured. (Tr. 1188-90).

Plaintiff contends that "[a]t no point in her April 26, 2013 decision did ALJ Horton review the claim de novo, as required[]" by this Court, and specifically, none of the severe impairments identified by the ALJ are "meaningfully evaluated . . . in the ALJ's decision[,]" so that reversal is mandated.  (Dkt. 19, Brief at 9-11).  Plaintiff also contends that the ALJ failed to follow the treating source rule as it is "impossible to square the ALJ's residual functional capacity evaluation with that provided by Dr. Conn[e]ly[,]" (id. at 12-13); "[d]espite a finding that 'cervical left (dominant) shoulder pain' constitutes a 'severe impairment[,]' . . . the ALJ never actually analyzes the limitations such pain causes[,]" and erroneously concludes that this Court "did not disturb the RFC finding in the 2010 decision[]" (id. at 14-15); the ALJ's vocational analysis is defective (id. at 15-24); and, the ALJ did not examine plaintiff's impairments in combination.  (Id. at 24-26).

Defendant does not dispute that the Court ordered the Agency to review plaintiff's claim de novo upon remand, but "maintains, however, that the ALJ[25] here complied with the

_____

[25]Throughout her brief, defendant erroneously refers to ALJ Horton as "he."  (See Dkt. #23, Brief at 4-17).

Court's order and conducted a <u>de novo</u> review of plaintiff's claim[,]" and any reference by the ALJ to the contrary is "harmless error at most[]" as the ALJ's decision is supported by substantial evidence. (Dkt. #23, Brief at 4-5)(footnote added).  Defendant contends that the opinions of Drs. Golkar, Staub and Saffir support the ALJ's RFC finding and are supported by the "largely normal MRI examinations of plaintiff's shoulder, back and hip[]" (<u>id.</u> at 6-7); the ALJ was not required to evaluate the medical opinion from Dr. Connely as such opinion, which was completed in March 2007, is not relevant to the period at issue in this case (<u>id.</u> at 8-9); the ALJ's credibility evaluation is supported by objective findings in the medical record, and plaintiff does not cite to any specific evidence supporting a more restrictive RFC than the ALJ assigned to her (<u>id.</u> at 9-11); the ALJ properly considered the combination of plaintiff's impairments, including her obesity (<u>id.</u> at 11-12); and substantial evidence supports the ALJ's step five finding that plaintiff retained the capacity to perform other work (<u>id.</u> at 12-16).  Defendant also contends that should this Court find that the ALJ's decision is unsupported, this case should be remanded for further development, not for payment of benefits.  (<u>Id.</u> at 16-17).

As stated above, defendant all but concedes that the ALJ did not conduct a <u>de novo</u> review as ordered by the Court, but claims that the ALJ's decision not to "disturb" the prior administrative decision's RFC determination is "harmless error at most[]" as substantial evidence supports the ALJ's decision and analysis.  (Dkt. #23, Brief at 4).  As referenced above, ALJ Horton's decision does not contain a <u>de novo</u> review of this case. Contrary to plaintiff's argument, the failure to comply with a remand order, however, does not mandate a remand for payment of benefits.  <u>See Strauss v. Comm'r of Soc. Sec.</u>, 635 F.3d 1135, 1138 (9th Cir. 2011)("We do not disturb the district court's conclusion that, in fact, the ALJ failed

to comply with the remand orders.  We hold only that the court may not move from that conclusion directly to an order requiring the payment of benefits without the intermediate step of analyzing whether, in fact, the claimant is disabled. We therefore remand to the district court for further proceedings.").  The issue before this Court is whether the ALJ's decision is supported by substantial evidence or if the decision is based on legal error. Burgess, 537 F.3d at 127; see also New York v. Sec'y of Health & Human Servs., 903 F.2d 122, 126 (2d Cir. 1990)(the court is required to "review the record as a whole[]" in assessing whether the evidence supports the Commissioner's position)(citations omitted).   As the Second Circuit has made clear, "'[w]here the Commissioner's decision rests on adequate findings supported by evidence having rationale probative force, we will not substitute our judgment for that of the Commissioner.'"  Mancuso v. Astrue, 361 F. App'x 176, 179 (2d Cir. 2010), quoting Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

In her decision, the ALJ discussed, albeit briefly, plaintiff's cervical and left shoulder pain, obesity and gastric bypass surgery in 2004, lumbar disc condition, and left rotator cuff condition[26] before reaching her RFC assessment (Tr. 1183-87), and plaintiff does not point

---

[26]Plaintiff is correct that although the ALJ considered plaintiff's vascular headaches and obesity to be "severe" impairments, she did not address such impairments in her decision. (See Dkt. #19, Brief at 11, 24-26).  In her decision, ALJ Horton stated that "[t]he claimant also claims migraine headaches[,]" and then she concludes, "[t]he Appeals Council and Court have not changed the prior finding that her combined impairments do not meet or equal any Listing." (Tr. 1184).  The ALJ's statement is erroneous to the extent that while the Court did not change the prior finding regarding plaintiff's combined impairments, the Court did order a de novo review upon remand.  That said, however, such error is harmless in light of the medical record upon which the ALJ relied in reaching her ultimate conclusion. (See also Tr. 1185 (The ALJ relied on the "State Agency physical medicine consultant [who] recommended her combined impairments would not prevent light work.")). The ALJ stated that she considered plaintiff's impairments singly and in combination and she considered plaintiff's weight at steps three and four. Her analysis is sufficient. DeJesus v. Astrue, No. 10 CV 705(CFD)(TPS), 2011 WL 2076447, at *3 (D. Conn. May 26, 2011)(The ALJ sufficiently considered plaintiff's combination of impairments when the ALJ examined plaintiff's medical records and  "explicitly stated that he considered the plaintiff's impairments in combination at several points in his decision."), approved and adopted absent objection, 10 CV 705(CFD), Dkt. #25 (D. Conn. July 12, 2011); Lopez v.  Astrue, No. 09 CV

to other information that shows that plaintiff is more limited than the ALJ determined. See 20 C.F.R. § 404.1512(c); Seekins v. Astrue, No. 3:11CV264(VLB)(TPS), 2012 WL 4471266, at *7 (D. Conn. Aug. 14, 2012)("[P]laintiff ha[s] the burden of establishing her RFC, which is used at steps four and five . . . to determine whether she could perform past work or other work existing in significant numbers in the national economy.")(additional citations omitted), approved and adopted over objection, 2012 WL 4471264 (D. Conn. Sept. 27, 2012). Additionally, when determining whether a claimant is disabled, the Commissioner considers all of the claimant's symptoms, "including pain, and the extent to which [the claimant's] symptoms can reasonably be consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). In this case, the ALJ appropriately noted that plaintiff's MRI and x-ray results for the period at issue revealed no significant abnormalities (Tr. 1183, 1185), and the objective medical evidence from the relevant time period supports ALJ Horton's (limited) analysis of plaintiff's impairments, and importantly, supports her RFC assessment.

As discussed above, plaintiff first sought treatment from her internist the day after the June 27, 2005 accident at which time she reported that she had not "needed Oxycontin for [a] couple months – [but she] took [it] last night." (Tr. 197). X-rays of her lumbar spine, taken on July 6, 2005, "showed some degenerative changes to L5-S1 interspace[,]" but "[o]therwise, [the] alignment [was] normal[,]" the hips showed "maintained joint space[,]" and the knee looked "reasonably well." (Tr. 176). An MRI of plaintiff's cervical spine taken

---

1963(VLB)(TPS), 2010 WL 3431624, at *4 (D. Conn. Aug. 30, 2010)(relying on statements by the ALJ that he found that the plaintiff "did not have an impairment or combination of impairments . . ." as evidence that the ALJ properly considered the combined effect of plaintiff's impairments), approved and adopted absent objection, 09 CV 1963(VLB), Dkt. #17 (D. Conn. Nov. 24, 2010).

on August 27, 2005 was "[n]egative[.]"  (Tr. 123, 125, 262).  As the ALJ noted, the September MRI of plaintiff's left shoulder revealed a partial tear, but plaintiff did not require surgery at that time. (Tr. 1183).  She underwent an MRI of her right hip on September 25, 2005, which showed "some tiny subchondral cystic changes which [were] nonspecific[,]" and which "could" have been "some very small arthritic type cystic changes." (Tr. 121, 126, 344-45).  In December 2005, Dr. Saffir "felt that [plaintiff] would probably not require surgery for [her] back . . . and that she could return to her light-duty job [that she was] currently doing." (Tr. 117-18; see also Tr. 162-63, 167-68).  Dr. Saffir's opinion was in accord with the conclusion of Dr. Staub who completed an IME for her employer's long-term disability plan on November 16, 2005; he opined that plaintiff could return to a light duty job.  (Tr. 302-06).  Similarly, although plaintiff's complaints of persistent pain continued beyond her date last insured, electro diagnostic studies were benign.  (See Tr. 104-05, 119, 147-61; see Tr. 147 ("again normal electro diagnostic studies[]"; Dr. Saffir noted that he does "not have many recommendations left."), 152 ("lumbar MRI scan was noted to be benign and there were only mild findings for right DJD on prior imaging studies with Dr. Hermele."), 158 ("X-rays are totally unremarkable. . . . Etiology unclear.")).  In February 2006, plaintiff reported moderate to severe pain with prolonged sitting of more than an hour, and "difficulty doing computer work[,]"  (Tr. 119, 162; see generally Tr. 104-05), and a month later in March 2006, Dr. Saffir restricted plaintiff to sedentary work with no heavy lifting of more than ten pounds. (Tr. 120, 161).  Five months after plaintiff's date last insured, Dr. Staub opined that plaintiff is "suitable for a sedentary job[]" in which she could "stand and stretch periodically[.]" (Tr. 298).

The foregoing objective medical findings, and the foregoing medical opinions, are

consistent with the January 2006 Vocational Analysis completed for Connecticut DDS, and with the January 2006 RFC assessment by Dr. Golkar, a State agency doctor. (Tr. 83, 95-102).  In the Vocational Analysis, plaintiff was found not disabled, as she was "expected to be able to return to her past work as an office manager, . . . because it [was] described as sedentary work." (Tr. 83).  Dr. Golkar, who relied on plaintiff's 2005 medical records, opined that plaintiff was capable of occasionally lifting twenty pounds, frequently lifting ten pounds, standing and/or walking or sitting for about six hours in an eight-hour workday, and occasionally climbing, balancing, stooping, kneeling, crouching and crawling.  (Tr. 96-97, 102).  He also opined that plaintiff was limited to occasional overhead reaching on the left side, and that plaintiff should avoid concentrated exposure to vibrations.  (Tr. 97-99).  Similarly, in April 2006, Dr. Hanny, another State agency doctor, "affirmed[]" Dr. Golkar's assessment after "review[ing] all the evidence in [the] file[.]" (Tr. 145; see Tr. 138-45).

It was well within the ALJ's province "to piece together the relevant medical facts from the findings and opinions of multiple physicians[,]" Seekins, 2012 WL 4471266, at *8 (citations & internal quotations omitted), and it is evident in her RFC assessment that she did just that.  ALJ Horton's RFC assessment limiting plaintiff to sedentary work, with the additional limitations of occasional overhead reaching with her dominant left arm and occasional handling, grasping and fingering with her dominant left hand, occasional standing, walking, bending, stooping, kneeling, crouching and crawling, unlimited use of the nondominant right shoulder, arm, hand and fingers, and avoidance of concentrated exposure to vibrations, is supported by the foregoing evidence of record, and in fact, is more restrictive than the limitations imposed by plaintiff's treating doctors.  (Tr. 1184).

While the Court appreciates the argument made by plaintiff's counsel regarding her

35

extensive medical history that pre-dated her onset date of disability in this case (see Dkt. #19, Brief at 10-11), the medical evidence from the very finite time period at issue in this case does not establish that plaintiff was disabled, and accordingly, the ALJ did not err in her reliance thereon.  Additionally, although plaintiff contends that the ALJ violated the treating physician rule by not relying on the medical opinion of Dr. Connely, this opinion was offered more than a year after plaintiff's date last insured.  (See Tr. 90, 250).  While a treating physician's retrospective diagnosis is "entitled to controlling weight unless it is contradicted by other medical evidence or overwhelming compelling non-medical evidence[,]"  Reynolds v. Colvin, 570 F. App'x 45, 48 (2d Cir. 2014)(citations & internal quotations omitted), there is no evidence that the opinion relates back to plaintiff's condition between June and December 2005.[27]  Accordingly, the ALJ did not err in this issue.

Plaintiff also contends that the ALJ erred in her credibility determination, such that "[i]t is not merely . . . deficient, it is . . . non-existent." (Dkt. #19, Brief at 15; see id. at 14-

---

[27]Moreover, this opinion is not consistent with the opinions of plaintiff's other treating specialists at that same time, which, again, was over a year after plaintiff's date last insured. (See, e.g., Tr. 211 (January 2007: Dr. Saffir found plaintiff "capable [of] sedentary work, but that alternate positions would be necessary as constant sitting or standing would be limited and difficult."), 210 (February 2007: Dr. Saffir noted that plaintiff was "looking to resume work activities[,]" and he "believed that a resumption of regular activities including employment [would] be good for her overall health and state of mind."); 223-29, 307-13 (April 2007: plaintiff is capable of sedentary work); 314 (April 2007: Dr. Webb opined that plaintiff could perform light duty work, which would involve lifting and carrying up to twenty pounds occasionally, sitting occasionally, and standing and walking frequently, with the additional restriction of avoiding repetitive motion of the wrists), 330 (May 2007: Dr. Saffir reported to Liberty Mutual that plaintiff is capable of light work but without periods of long standing), 292 (July 2007: Dr. Marino opined that plaintiff is capable of light or sedentary work with limitations), 542 (July 2007: Dr. Saffir opined that plaintiff "will likely remain in the sedentary to light category for future work activities[,]" and that she has limited functional capacity for squatting, crouching, kneeling, and crawling.)).

Additionally, the ALJ also refers to a statement by Dr. Walter Pleban that predates plaintiff's onset date by four years.  (Tr. 1185).  Other than to evidence plaintiff's long history of medical issues, which the ALJ acknowledged in her decision when she noted that plaintiff "has severe impairments and medical limitations," this statement has no bearing on the relevant period of disability at issue in this case. (Tr. 1185, 1187).

15).   In her decision, although the ALJ states that "[t]he 2012 Remand Orders do not find

fault with the credibility analysis[,]" she does not adopt the earlier credibility assessment, but

rather, concludes that: "[i]n summary, [plaintiff's] assertion that her July 2005 accident left

her totally disabled, with neck, hip, shoulder and back injuries, is not fully credible in light

of her treatment in 2005-2006."  (Tr. 1187).  The ALJ reaches this conclusion through her

reliance on plaintiff's MRI studies, and the objective medical reports discussed above.  The

ALJ then concluded that "[a]fter careful consideration of the evidence," plaintiff's "medically

determinable impairments could reasonably be expected to cause moderate physical

limitations[,] [and] [h]er allegation that she could not sustain sitting, standing, walking and

computer work, for any type of job, is not entirely credible." (Id.).  The ALJ also was not

convinced by plaintiff's claims that her chronic pain is connected to the June 2005 accident

in light of plaintiff's aggravated symptoms a year after her date last insured, and her 2008

fall which aggravated her pain. (Id.).   Thus, contrary to plaintiff's contention, the ALJ's

credibility assessment is neither deficient nor non-existent.  Moreover, it is the province of

the Commissioner, not the reviewing court, to determine the credibility of a claimant.  See

Carroll v. Sec'y of Health & Hum. Servs., 705 F.2d 638, 642 (2d Cir. 1983).  "[T]he ALJ is

required to take the claimant's reports of pain and other limitations into account, but is not

required to accept the claimant's subjective complaints without question; [she] may exercise

discretion in weighing the credibility of the claimant's testimony in light of the other evidence

in the record." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010)(internal citations omitted).

In this case, the ALJ's credibility determination included consideration of the case record,

including the objective medical evidence, as discussed above, as well as plaintiff's statements

and the statements of her treating providers.  See Social Security Ruling ["SSR"] 96-7p, 1996

WL 374186, at *1 (S.S.A. July 2, 1996).  "Where the [plaintiff's] testimony concerning pain and functional limitations is not supported by objective evidence, the ALJ retains discretion in determining the plaintiff's credibility with regard to disabling pain and other limitations." Perez v. Colvin, No. 13 CV 868(HBF), 2014 WL 4852836, at *23 (D. Conn. Apr. 17, 2014)(citations omitted), approved and adopted over objection, 2014 WL 4852848 (JCH)(D. Conn. Sept. 29, 2014).

In the case at hand, the ALJ properly "note[d] the absence of such supportive [objective] medical evidence in [her] overall credibility determination[,]" Bathrick v. Astrue, No. 11 CV 101(VLB), 2012 WL 1068985, at *6 (D. Conn. Mar. 29, 2012)(multiple citations omitted), and she provided support for her credibility finding. See SSR 96-7p, 1996 WL 374186, at *4 (credibility findings must contain "specific reasons . . . supported by the evidence of the case record, and must be sufficiently specific to make clear . . . the weight" assigned by the ALJ, and the "reasons for that weight."). Accordingly, the Court will defer to the ALJ's credibility determination.

Plaintiff's final argument is that the ALJ's vocational analysis is defective, in part because it is based on an erroneous RFC assessment which led to hypotheticals that did not accurately portray the plaintiff's limitations  (Dkt. #19, Brief at 15-18), and in part, because the vocational expert's testimony regarding the number of positions available for the jobs of surveillance system monitor and information clerk is unreliable.  (Id. at 19-23).  As discussed above, this Court has concluded that the ALJ's RFC assessment is based on substantial evidence.   Additionally, the hypotheticals posed by ALJ Horton to Takki reflected the limitations incorporated into ALJ Horton's RFC determination.  Specifically, at the hearing, the ALJ posed a hypothetical of an individual who is limited to sedentary work but is further

limited to occasional overhead reaching with her left dominant arm and is limited to occasional standing, walking, bending and stooping, and must avoid concentrated exposures to vibrations (Tr. 1375), and is "further limited such that handling, grasping and fingering with the dominant left hand were also limited to occasional[,]" and the vocational expert testified that such an individual could perform the work of an information clerk and a surveillance system monitor. (Tr. 1376-78).

The vocational expert then testified extensively about the methodology that he uses to reach the number of jobs available. (Tr. 1378-80). Specifically, he testified that he uses Skill Tran, which is "a computer software program" that "gets its records from the Bureau of Labor Statistics[,]" but since the creators of Skill Tran "admit . . . that . . . there's no way to adequately predict the exact number of jobs at any one time in any one place[,]" the vocational expert also "look[s] at [his] [thirty] years of placing individuals with disabilities knowing what the general economy is like in New England." (Tr. 1379). The vocational expert testified to his experience doing "labor market surveys, . . . placement plans, [and] . . . vocational assessments." (Id.). In this case, the ALJ found that although

> plaintiff's counsel challenged the use of a computerized manual called "Skill Tran" to generate numbers of jobs, especially for the claimant's pain problems . . . [the ALJ] [found] that Mr. Takki is a qualified, impartial Vocational Expert, with over [twenty-five] years of placement experience pertinent to this appeal. The Court directed that the undersigned take vocational testimony, and counsel has the opportunity to cross-examine the expert and to develop the claimant's job skills. Mr. Takki incorporated standard, published data and his own vocational experience; he stated he "conservatively" reduced published numbers accordingly. Mr. Takki explained that the published data comes from a "Skill [T]ran" program, which includes federal labor bureau statistics. Employers' reports are incorporated into that data and are assigned by D.O.T. codes.
>
> . . .
>
> Pursuant to SSR 00-4p, [2000 WL 1898704 (S.S.A. Dec. 4, 2000),] the

> undersigned has determined that the vocational expert's testimony is consistent with the information contained in the <u>Dictionary of Occupational Titles</u> plus his vocational experience.

(Tr. 1189-90).  The vocational expert's methodology is consistent with the Regulations.  <u>See</u> 20 C.F.R. § 404.1566(d)(administrative notice may be taken from various governmental and other publications, and the ALJ is permitted to rely on sources other than the DOT). Moreover, the vocational expert's testimony is consistent with the approach taken by "[d]istrict courts within the Second Circuit[,]" that is, to follow the "Seventh Circuit['s] approach [of requiring some evidentiary basis to rely up the opinions of the vocational expert.]" <u>Wages v. Comm'r of Soc. Sec.</u>, No. 11 CV 1571(JCH), 2013 WL 3243116, at *6 (D. Conn. Jun. 26, 2013), <u>quoting Jones-Reid v. Astrue</u>, 934 F. Supp. 2d 381, 407 (D. Conn. 2012)(internal citations omitted)(ALJ did not err in relying on vocational expert's testimony based on personal experience, labor market surveys, and published statistical sources in determining the number of jobs available), <u>aff'd</u>, 515 F. App'x 32 (2d Cir. 2013).

Plaintiff claims that the vocational expert's testimony as to the number of jobs that exist in Connecticut and nationally is "nonsense" and a "farce" given the reduction in numbers as the vocational expert re-ran the inquiry through Skill Tran while under cross-examination by plaintiff's counsel. (Dkt. #19, Brief at 19-22).  The issue in this case, however, is not the vocational expert's testimony as to the number of jobs available at the time the testimony was taken, but rather, the number of jobs available during the narrow relevant period at issue  – namely – from June to December 2005.  Accordingly, the ALJ and the vocational expert engaged in the following colloquy:

> Q: Well based on your experience you say, you indicated [thirty] years experience in placing folks and, as a vocational expert. In 2005 would there have been more numbers, more of these jobs available in 2005 then [sic] there are today?

A: Yes, I would say that for the security system monitor as well as the information clerk. The information clerk is probably a little steadier, but as times get tougher jobs are consolidating and, and so these jobs are – so I would say, yes, the farther you go back the better the economy was and the more plentiful these jobs would be. That's been my experience.

Q: Well can you give me any kind of an estimate of the – you, you indicated that the information clerk numbers would be approximately the same but if, but the surveillance system monitor jobs going back to 2005, would there be . . . significantly more number[s] – more of those jobs and can you give me an estimate of how many more there would have been back in 2005?

A: Well I can tell you that there were [eighty-five] when I did this maybe a year and a half, two years ago and there were over 10,000 in the United States. Now that was two years ago.

Q: But we've had, we, we have had a significant downturn in the number of jobs in the country since 2000 and –

A: And that would be one of the jobs that are being replaced with central monitors and such that are displacing these types of jobs.

Q: But even back in, in 2000 and when was it that you said you had the other numbers?

A: That was in the last couple of years.

Q: And that was how many in the last couple of years?

A: There were [eighty-five] in the state of Connecticut.

(Tr. 1391-92). Thus, the vocational expert testified that based on his experience, there would be largely the same number of information clerk jobs in 2005, or 1,296 positions in Connecticut, or even more surveillance system monitor positions in 2005, or greater than eighty-five surveillance system monitor positions. (See Tr. 1384, 1392). Defendant argues that with such numbers, "there would still be a substantial number of jobs that plaintiff could perform." (Dkt. #23, Brief at 16).

An individual is disabled under the Act "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his

[or her] previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy . . . . " 42 U.S.C. § 423(d)(2).  "[W]ork which exists in the national economy" is defined as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  Id.; see also 20 C.F.R. § 404.1566(a).   Neither the Social Security Act, nor the Commissioner's Regulations or Rulings provide a definition for a "significant" number of jobs.  Earlier this year, U.S. Magistrate Judge Denise K. LaRue of the Southern District of Indiana tackled this issue by reviewing the definitions provided in the Regulations and the Act and the numbers found "significant" by other circuit courts.  Schadenfroh v. Colvin, No. 13 CV 223(SEB)(DKL), 2014 WL 1260123 (S.D. Ind. Mar. 27, 2014).  In that case, Judge LaRue observed that the Act and the Regulations provide that the numbers that apply to the claimant's "region" of residence, or more likely as identified by the vocational expert, the State numbers are the numbers that are relevant to the Court's analysis.  Id. at *11.  Judge LaRue continued, "[w]ith no logical, principled standard by which to judge whether the numbers of jobs are 'significant' under the Act, courts[ ] are left with hunches that are constrained only by the numbers that are held significant in precedential decisions."  Id. at *13.  Within the Second Circuit,  "courts have refused to draw a bright line standard for the minimum number of jobs required to show that work exists in significant numbers[,]" Barbato v. Astrue, No. 09 CV 6530T, 2010 WL 2710521, at *7 (W.D.N.Y. July 7, 2010)(citation omitted), but "[c]ourts have adopted a relatively low threshold number."  Id., citing Lee v. Sullivan, 988 F.2d 789, 794 (7th Cir. 1993)(1,400 jobs is a significant number); Allen v. Bowen, 816 F.2d 600, 602 (11th Cir. 1987)(174 positions within the local economy is a significant number); Dumas v. Schweiker, 712 F.2d 1545, 1549, 1553-54 (2d Cir. 1983)(150 jobs regionally constituted significant

numbers).  However, in Lee, the Seventh Circuit only noted that Lee's contention that 1,400 job positions is not a significant number of jobs was unsupported by case law, and included in its cited list of cases was the Allen case.  Lee, 988 F. 2d at 794.  In Allen, the Eleventh Circuit rejected 174 jobs in the "local economy[,]" and held that "[t]he appropriate focus under the [R]egulation, however, is [not the local economy but] the national economy."  816 F.2d at 602-03.  In Dumas, the Second Circuit's holding was not based on whether 150 jobs constituted significant numbers, but instead whether the vocational expert's opinion that Dumas had transferable skills to jobs abundant in the national economy satisfied the Secretary's burden at step five.  712 F.2d at 1553-54.  Defendant also relies on Fox v. Comm'r of Soc. Sec., No. 6:02 CV 1160(FJS)(RFT), 2009 WL 367628, at *20 (N.D.N.Y. Feb. 13, 2009), in which the district court, relying on the cases cited above, among others, concluded that the 200 surveillance system monitor jobs identified by the vocational expert in the Central New York region, "even if diminished by a small percentage in his estimation, constitutes a significant number of jobs, which the ALJ properly relied upon in finding that work existed in the national and regional economy that [p]laintiff could perform[.]"

In this case, eighty-five surveillance system monitor jobs is a much lower number, however, the vocational expert testified that, in 2005, there were roughly 1,296 information clerk jobs available in Connecticut, and 152,000 nationally.  (See Tr. 1384, 1392).  Thus, even if the eighty-five surveillance system monitor jobs did not constitute a significant number of available jobs in this region, 1,296 information clerk jobs is significant, particularly when just a few months ago, Chief United States District Judge Janet C. Hall found that half of that number of positions, or 620 positions available in Connecticut, is a significant number of jobs.  Durante v. Colvin, No. 13 CV 1298(JCH), 2014 WL 4843684, at *5 (D. Conn. Sept.

29, 2014); see Dugan v. Soc. Sec. Admin., Comm'r, 501 F. App'x 24, 25 (2d Cir. 2012)(noting vocational expert's testimony identifying two jobs with a total of 600 positions in Vermont and 344,000 positions nationwide); see also Flores v. Astrue, No. 09 CV 1829 (JCH)(HBF), 2010 WL 5129121, at *10, 15 (D. Conn. Sept. 24, 2010)(affirming the ALJ's findings among which was the identification of a significant number of jobs available in occupations with 1,500 positions within the region and 150,000 positions nationwide, 1,200 positions within the region and 100,000 nationally, and 900 positions within the region and 130,000 nationally), approved and adopted over objection, 2010 WL 5129110 (D. Conn. Dec. 9, 2010).  Accordingly, the ALJ was entitled to rely on such testimony as the vocational expert identified a significant number of jobs available.

## V. CONCLUSION

For the reasons stated above, plaintiff's Motion to Reverse the Decision of the Commissioner (Dkt. #19) is denied, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #23) is granted.

The parties are free to seek the district judge's review of this recommended ruling. See 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 16th day of March, 2015.


_/s/ Joan G. Margolis, USMJ_
Joan Glazer Margolis
United States Magistrate Judge